569 So.2d 481 (1990)
GENERAL TIRE SERVICE and Liberty Mutual Insurance Company, Appellants,
v.
SPECIAL DISABILITY TRUST FUND, Appellee.
No. 89-562.
District Court of Appeal of Florida, First District.
September 27, 1990.
Rehearing Denied December 3, 1990.
*483 Jeffrey A. Stone of Beggs & Lane, Pensacola, for appellants.
Mary E. Ingley, Sp. Disability Trust Fund, Tallahassee, for appellee.
ZEHMER, Judge.
In this workers' compensation case, we review an order denying the employer and carrier reimbursement from the Special Disability Trust Fund under section 440.49(2), Florida Statutes (1987), for excess compensation the carrier claims to have paid for temporary total disability benefits, remedial medical care, and wage loss benefits. We reverse because the order is erroneous in two respects argued by the appellants: (1) there is no requirement under section 440.49(2), read as a whole, that an employer and carrier, having otherwise qualified under the statute to receive reimbursement for excess permanent total disability compensation, actually pay permanent total disability benefits for more than 175 weeks before being entitled to reimbursement for temporary disability and remedial medical benefits previously paid pursuant to section 440.13; and (2) it was error to disallow reimbursement for wage loss benefits, paid pursuant to section 440.15(3)(b) during the first six months after the claimant reached maximum medical improvement with a permanent impairment, for the sole reason that the carrier subsequently agreed to accept the claimant's entitlement to permanent total disability benefits under section 440.15(1) retroactive to the date of maximum medical improvement. Regarding the Fund's crossappeal, there is competent substantial evidence in the record to support the judge's finding of merger as defined subsections 440.49(2)(b)2.a (the "but for" merger) and b (the increased disability merger), and accordingly we affirm that issue.
This case arose out of the following factual situation. On January 20, 1984, the claimant, Eddie Lee Brown, a fifty-six year old mentally retarded tire changer employed by General Tire Services, sustained a severe permanent injury to his right arm because he failed to use a safety device provided by his employer when the rim of a truck wheel exploded due to air pressure in the tire. Brown also sustained a less serious head injury. The employer's workers' compensation carrier, Liberty Mutual Insurance Company, accepted the injury as compensable and paid temporary disability benefits and remedial medical expenses from that date. On July 19, 1985, the carrier filed a BCL-4 form with the Division of Workers' Compensation reporting that temporary total disability benefits had been suspended as of May 30, 1985, because the claimant had reached maximum medical improvement on that date. As a result of the claimant's unsuccessful work searches, permanent wage loss benefits pursuant to section 440.15(3)(b) were paid each month until December 20, 1985, when the carrier filed another BCL-4 form reporting that it had accepted the claimant as entitled to permanent total disability benefits pursuant to section 440.15(1), retroactive *484 to May 7, 1985.[1] These PTD benefits were paid until the claimant's death on February 15, 1987, due to heart failure that had no relationship to the industrial accident of January 20, 1984.
The Special Disability Trust Fund denied the carrier's claim pursuant to section 440.49(2) for reimbursement of the temporary disability benefits, wage loss benefits, and remedial medical care benefits previously paid, asserting as defenses that: (1) the claimant had no preexisting permanent impairment; (2) there was no informed conclusion on behalf of the employer regarding any preexisting permanent impairment; (3) there was no merger within the statutory definitions; (4) the carrier had paid no excess compensation; (5) the carrier had paid less than 175 weeks of PTD benefits and the claimant's death was unrelated to the industrial accident; and (6) there was no basis for reimbursement of medical or temporary disability benefits. An evidentiary hearing was held by the judge of compensation claims on the issues thereby made.
In the order entered shortly after the evidentiary hearing, the judge found the facts essentially as set forth above. He specifically noted that "wage-loss benefits paid were reclassified as compensation for PTD" and concluded that, "based on the facts and the retroactive acceptance [of claimant's PTD status] for the purposes of this claim, no wage loss benefits were paid which would permit reimbursement under F.S. 440.49(2)(c)2." He found that PTD benefits had not been paid for 175 weeks and thus no "excess" PTD benefits had been paid by the carrier. He further found that the claimant, both before and after the industrial accident, was mentally retarded within the meaning of subsection 440.49(2)(f)1.v and that the employer made an informed conclusion prior to the claimant's injury that his preexisting mental retardation was permanent and would be a hindrance or obstacle to his employment. The judge found that "but for" the claimant's preexisting mental retardation condition the claimant would have followed safety instructions and used the safety cage provided by the employer and consequently would not have been injured when the tire blew off the rim, so there was a merger within the meaning of subsection 440.49(2)(b)2.a. He also found that the claimant's preexisting mental retardation "merged with the subsequent job related permanent injury to cause a disability materially and substantially greater than that which would have resulted from the arm injury alone."[2] The order then recites:
12. In order to qualify for entitlement to reimbursement for temporary total disability and medical benefits paid, the e/c must also qualify for reimbursement from the Fund for permanent total disability. F.S. 440.49(2)(e). The Fund argues with considerable persuasion that it is absolutely fundamental to the basic philosophy of the reimbursement concept that some excess must be paid by an e/c based on a merger of the pre-existing and the compensable injury to meet the threshold of entitlement. Southland Corp. v. SDTF, 526 So.2d 1039 (Fla. 1st DCA 1988). It has already been noted that no excess PTD benefits have been paid in this case and that in retrospect no wage-loss benefits at all were paid. Except for some rather curious language contained in F.S. 440.49(2)(c)3, the case should be resolved in favor of the Fund and against the e/c on this point alone, i.e., no excess payment  no entitlement to reimbursement.
13. F.S. 440.49(2)(c)3 requires the Fund to "... immediately reimburse ..." the e/c all "... excess compensation paid for TTD and remedial treatment ... upon determination that a merger has caused permanent total disability ...". The e/c argues that in order to make any sense of this language, the legislature did not intend to create a 175 week waiting period before reimbursement for TTD paid in PTD cases. The *485 e/c goes on to argue that once a merger has been proved compensation for TTD must be "... immediately reimbursed ...". Indeed the Fund concedes that in practice this is frequently done. However, the Fund argues that this practice does not necessarily mandate a statutory interpretation contrary to the fundamental principle that an excess must be paid before entitlement to reimbursement.
14. Needless to say the statutory requirement that the Fund "... immediately ..." reimburse excess TTD and medicals in PTD is, at best, puzzling. Under F.S. 440.49(2)(e), the first link in [the] chain of requirements needed to prove entitlement to reimbursement for TTD and remedial medicals is entitlement to reimbursement from the Fund for PTD. In this case, no such entitlement existed because the e/c paid benefits for less than 175 weeks. In the case of wage-loss, permanent impairment and death, benefits are payable upon the moment of entitlement and are not contingent upon a waiting period. Therefore, except in PTD cases, excess benefits are payable at once without a waiting period. Although the word "... immediately ..." is certainly confusing in light of the 175 week waiting period, subsection .49(2)3 still requires only the reimbursement for excess TTD compensation and remedial treatment. In light of the Fund's current practice of immediate reimbursement in similar situations, one is tempted to require reimbursement to the e/c in this case. However, such a ruling would clearly conflict with the basic philosophy of the Special Disability Trust Fund, which is to reimburse e/c's for excess compensation paid on account of a merger of a pre-existing condition and a compensable injury. For that reason, the claim must be denied. Perhaps someone with greater insight into the mysteries of the legislature can better explain the apparent conflict between the philosophy of the Fund statute and the apparent requirement that immediate reimbursement of compensation for TTD and remedials be made as soon as it is determined that a merger has caused permanent total disability.
(R. 114-19). The judge's order adequately reflects the essence of the parties' differing contentions on this appeal.
While we do not profess to have "greater insight into the mysteries of the legislature" than the very able judge of compensation claims in this case, we do believe that the Fund's argument has misconceived the meaning and intent of the statutory provisions and has thus misled the judge into committing error in requiring that excess PTD benefits [meaning more than 175 weeks of benefits] must be paid before the employer and carrier can become entitled to reimbursement for medical and temporary disability benefits in a PTD case such as this. In construing the statutory scheme, it is important to keep in mind the stated purpose of subsection 440.49(2) to
encourage the employment of the physically handicapped by protecting employers from excess liability for compensation and medical expense when an injury to a handicapped worker merges with his preexisting permanent physical impairment to cause a greater disability, permanent impairment, or wage loss than would have resulted from the injury alone. The division shall inform all employers of the existence and function of the fund and shall interpret eligibility requirements liberally.
§ 440.49(2)(a), Fla. Stat. (1987). Adhering to these statutory admonitions, we conclude that under the circumstances of this case the statute requires only that (1) the employer or carrier have paid excess benefits of the character being claimed as a prerequisite to reimbursement (i.e., TTD and remedial medical), not excess PTD benefits, and that (2) the employer and carrier also demonstrate that a merger has occurred such that they would be entitled to reimbursement for excess PTD benefits at the end of the 175-week period. We arrive at this conclusion based on the following analysis of the statute.
Subsection 440.49(2)(b)2 specifies that "`merger' describes or means" that:

*486 a. Had the permanent physical impairment not existed, the subsequent accident or occupational disease would not have occurred.
b. The permanent disability, permanent impairment, or wage loss resulting from the subsequent accident or occupational disease is materially and substantially greater than that which would have resulted had the permanent physical impairment not existed and the employer has been required to pay, and has paid, permanent total disability, permanent impairment, or wage-loss benefits for that materially and substantially greater disability... .
The statutory requirement that the employer "has been required to pay, and has paid, permanent total disability, permanent impairment, or wage-loss benefits for that materially and substantially greater disability" simply means that a merger under this subparagraph cannot be established until the employer or carrier has actually made some payment of the described permanent benefits [either for permanent impairment under section 440.15(3)(a), wage loss under section 440.15(3)(b), or PTD under section 440.15(1)] on account of a demonstrated increased disability attributable to the combined effect of both permanent impairments. This statutory language does not refer to "excess" compensation and does not require that the employer or carrier must have paid excess permanent compensation, such as excess PTD benefits under subsection 440.49(2)(c)3 for more than 175 weeks.
Subsection 440.49(2)(b)3 defines "excess permanent compensation" to mean "that compensation for permanent impairment, wage-loss benefits, or permanent total disability or death benefits for which the employer or carrier is otherwise entitled to reimbursement from the Special Disability Trust Fund." Subsection 440.49(2)(c) then sets forth the various benefits and criteria for entitlement to reimbursement by the Fund.
Subsection 440.49(2)(c)1 authorizes reimbursement, subject to the limitations in 440.49(2)(f), for 60 percent of all permanent impairment benefits which the employer has been required to pay pursuant to section 440.15(3)(a), provided that the subsequent permanent impairment from the industrial accident has "merged," as statutorily defined, with the preexisting permanent physical impairment to cause permanent impairment. Under this section, the very first payment of permanent impairment benefits would necessarily include excess compensation.
Subsection 440.49(2)(c)2 authorizes reimbursement, subject to the same limitations in paragraph (f), for
60 percent of all compensation for wage loss which the employer has been required to provide pursuant to s 440.15(3)(b) during the first 5 years after the date of maximum medical improvement and for 75 percent of all compensation for wage loss which the employer has been required to provide after the 5-year period following the date of maximum medical improvement,
provided that the claimant's subsequent permanent impairment caused by the industrial accident "merges with the preexisting permanent physical impairment to cause a wage loss." Again, the very first payment of wage loss benefits would include excess compensation as defined in section 440.49(2)(b)3.
Subsection 440.49(2)(c)3 authorizes reimbursement, subject to the same limitations in paragraph (f), for "all compensation for permanent total disability which is in excess of the first 175 weeks of permanent total disability compensation, provided that the claimant's subsequent permanent impairment caused by the industrial accident merges with the preexisting permanent physical impairment to cause permanent total disability."[3] It is clear that excess compensation for PTD is to be measured differently than excess compensation for permanent impairment and wage loss benefits *487 described in the two immediately preceding subparagraphs, in that rather than a percentage of payments from the beginning, the employer and carrier are made responsible for an initial period (the first 175 weeks) and the Fund is made responsible for all benefits paid thereafter. This criterion for determining excess PTD compensation does not mean, however, that determination of entitlement to reimbursement for excess PTD benefits paid by reason of the requisite merger must necessarily await the end of the 175-week period. "Entitlement to reimbursement" should not be confused with actual payment of excess permanent compensation.
Each of the paragraphs numbered 1 through 3 in subsection 440.49(2)(c) requires that "the employer shall, in the first instance, pay all benefits provided by this chapter."[4] In addition, subparagraph 3 specifically provides:
Upon a determination that a merger has caused permanent total disability, the employer shall be immediately reimbursed from the [Fund] for all excess compensation paid for temporary disability and remedial treatment subject to the limitations of paragraphs (e) and (f).
A plain reading of this language in context with the entire section demonstrates clear statutory intent to authorize reimbursement for the temporary and remedial benefits previously paid by an employer and carrier immediately upon the determination that a merger of permanent conditions as defined in subsection 440.49(2)(b)2 has occurred and caused permanent total disability, as provided in subsection 440.15(1). The only permissible inference that can be drawn from this language is that once a merger of the requisite conditions has been established, reimbursement of the employer and carrier need not be deferred until they have commenced paying excess PTD benefits as such may become due, but that the employer and carrier can obtain "immediate" payment of the temporary and remedial benefits already paid once this merger and resulting permanency has been established and payment of PTD benefits (as distinguished from excess PTD compensation) has commenced.
Subsection 440.49(2)(e), referred to in subsection 440.49(2)(c)3, defines the right to reimbursement for temporary disability and remedial care benefits in the following language:
Subject to the limitation specified in paragraph (f), and when the preexisting permanent physical impairment has contributed to the need, either medically or circumstantially, for temporary disability and remedial treatment, care, and attendance, an employer entitled to reimbursement from the [Fund] for compensation paid for permanent impairment, wage loss, permanent total disability, or death shall be reimbursed from such fund for 50 percent of the first $10,000 paid as compensation for temporary disability and remedial treatment, care, and attendance pursuant to s. 440.13, for the same injury; thereafter, the employer shall be reimbursed from such fund for all sums paid by the employer as compensation for temporary disability and remedial treatment, care and attendance pursuant to s. 440.13 which are in excess of $10,000.
This statutory language likewise is perfectly clear. It sets the criteria for determining the amount of excess compensation paid for temporary and remedial benefits when the preexisting permanent condition is shown to have contributed to the need for such medical and temporary disability benefits. The Fund is directed to reimburse the stated percentages of such benefits *488 after they have been paid to the claimant upon a showing that the employer and carrier are entitled to reimbursement for compensation paid for either permanent impairment benefits, wage loss benefits, or permanent total disability benefits because a requisite merger of the preexisting and subsequent permanent conditions has been demonstrated. Nothing in the statutory language suggests that the reimbursement for such temporary and remedial benefits previously paid must await the subsequent payment of excess PTD compensation benefits.
The limitations in subparagraph (f) prohibits reimbursement "unless it is established that the employer reached an informed conclusion prior to the occurrence of the subsequent injury or occupational disease that the preexisting physical condition is permanent and is, or is likely to be, a hindrance or obstacle to employment." This subparagraph then sets forth a list of conditions that give rise to a conclusive presumption of the required hindrance or obstacle to employment, including "mental retardation" as found by the judge in this case. See § 440.49(2)(f)1.v.
From this analysis of the statutory language, it is readily apparent that an employer and carrier must establish the following elements to obtain reimbursement from the Fund for excess compensation paid: (1) a "merger" of the claimant's subsequent permanent impairment from the industrial accident with the claimant's preexisting permanent physical impairment in the statutorily-defined sense; (2) the conditions and limitations specified in subsection 440.49(2)(f) have been satisfied; (3) due to such merger, the employer and carrier have become entitled to reimbursement of excess permanent compensation; (4) the employer and carrier have in fact made payments of permanent impairment, permanent wage loss, or PTD benefits; and (5) at the time the reimbursement claim is made the employer and carrier have already made payments for either temporary disability benefits, remedial care and attendance benefits, or some element of permanent compensation benefits that are deemed excess compensation under the statutory criteria for reimbursement.
Applying this construction of the statutory provisions to the essential facts in this case, it is readily apparent that the employer and carrier were entitled to reimbursement for the excess TTD and remedial care benefits previously paid. The appealed order explicitly found, and the record supports the finding, that the claimant suffered from a preexisting condition of mental retardation that was conclusively presumed to be a hindrance to employment within the statutory definition, and that the employer knew of this condition and had reached an informed conclusion that the condition was permanent and was a hindrance or obstacle to employment. The order also found, and there is competent substantial evidence to support the finding, that the subsequent permanent impairment due to the claimant's arm injury merged with his preexisting mental retardation within the meaning of subsections 440.49(2)(b)2.a and b. The order further found, and the evidence supports the finding, that the claimant sustained a permanent impairment as a result of such merger that caused both a wage loss and permanent total disability, and caused the need for temporary disability and remedial medical care benefits. In short, the findings made in the order and supported by competent substantial evidence are sufficient to establish the employer and carrier's right to reimbursement under section 440.49(2) for the excess temporary disability and remedial care benefits previously paid.
The judge of compensation claims erred in accepting the Fund's argument that the employer and carrier could not qualify for reimbursement of the temporary compensation benefits and remedial medical until they had first paid excess permanent total disability compensation after the initial 175-week period. This ruling was based on the invalid premise that excess PTD benefits in that sense had to be paid before the employer and carrier could qualify for reimbursement for any temporary benefits previously paid regardless of a demonstrated merger within the meaning of section *489 440.49(2)(b)2 entitling them ultimately to have reimbursement for excess PTD benefits, as well as excess wage loss benefits or excess permanent impairment benefits. This construction of the statute completely defeats the remedial purpose of this legislation. Not only does it amount to a restrictive interpretation of eligibility, contrary to the mandate in subsection 440.49(2)(a) to "interpret eligibility requirements liberally," it also would operate to cause employers to defer accepting injured employees as PTD since, as the appealed order recognizes, payment of permanent wage loss benefits pursuant to section 440.15(3)(b) would give rise to an immediate right of reimbursement for previously paid temporary benefits. Requiring an employer and carrier to wait until excess PTD benefits are actually paid, i.e., more than 175 weeks, before being entitled to reimbursement under section 440.49(2) for excess temporary and remedial benefits paid would deter, and reasonably so, all but the most saintly of employers and carriers from accepting a claimant as PTD rather than as PPD (permanent partial disability) simply because the latter classification would give rise to a right to immediate reimbursement. We do not find anything in the statutory scheme to indicate a legislative intent to accomplish the result urged by the Fund and accepted by the judge of compensation claims in this case. The philosophy underlying the reimbursement provisions in section 440.49(2) does not rest upon the notion that payment of excess PTD benefits must occur before an employer and carrier may become entitled to reimbursement for temporary and remedial benefits already paid.
The Fund and the judge cite our decision in Southland Corp. v. Special Disability Trust Fund, 526 So.2d 1039 (Fla. 1st DCA 1988), in support of the Fund's construction of the statute and contend it is controlling on this issue. We disagree. In Southland Corp. the claimant died before he reached MMI, and there was never any determination of a merger of permanent conditions as there was in the instant case. Rather, in Southland the sole issue was whether the payment of the claimant's funeral expenses constituted payment of death benefits, there being no surviving dependents of the claimant to claim the statutory death benefit, so as to trigger the employer's right of reimbursement under section 440.49(2). The court simply held, and correctly so, that payment of funeral expenses did not amount to payment of "death benefits" within the meaning of section 440.49(2)(d). The court affirmed the denial of the employer's claim for reimbursement because no permanent impairment, permanent wage loss, permanent total disability, or death benefits had ever been paid to the claimant as required by the statute. These critically distinguishing facts make the holding of that case inapplicable to the issues presented in the case now before us.
We next address the ruling that no permanent wage loss benefits were paid because the carrier had retroactively accepted the claimant as PTD after paying wage loss benefits pursuant to section 440.15(3)(b) for a period of over six months. The evidence showed that the employer and carrier questioned whether claimant was PTD during this period, and required that he perform work searches, which were totally unsuccessful. Whether the employer and carrier should have accepted claimant as PTD back in May 1985 when he reached MMI is a matter of conjecture, for the undisputed fact is that they did not and no claim was filed by the claimant objecting to this decision. We find nothing in chapter 440, and more specifically nothing in section 440.49(2), that requires the reclassification of wage loss benefits paid pursuant to section 440.15(3)(b) to PTD benefits under section 440.15(1) simply because the employer and carrier subsequently agreed to accept the claimant as PTD retroactively. The Fund cites no statute or case authority compelling such reclassification. Adhering to the statutory mandate to interpret eligibility requirements liberally and recognizing that the payments were actually made pursuant to the wage loss provisions rather than the PTD provisions of the statute, we hold that it was error to deny the employer and carrier reimbursement for the permanent *490 wage loss benefits paid between May 1985 and December 1985.
Addressing the Fund's cross-appeal, we find ample competent, substantial evidence in the record to support the finding of merger under subsection 440.49(2)(b)2.a on the grounds that "but for" the claimant's preexisting permanent mental retardation the industrial accident would not have occurred. We likewise disagree with the Fund that the order contains no specific finding of fact that supports a merger under subsection 440.49(2)(b)2.b by reason of a materially enhanced disability. There is an explicit finding in the order that satisfies this statutory definition (note 2, supra), and this finding is supported by competent substantial evidence in the record.
The appealed order is reversed and the cause is remanded for entry of an order in conformance with this opinion.
REVERSED AND REMANDED.
BOOTH and NIMMONS, JJ., concur.
NOTES
[1] The parties have not focused on the difference between this date and the date originally accepted as MMI.
[2] This finding satisfies the criteria in subsection 440.49(2)(b)2.b.
[3] Subsection 440.49(2)(d), although not implicated in this case, provides for reimbursement when a merger of the preexisting and subsequent conditions causes death within the specified periods of time.
[4] This language does not mean that the employer and carrier cannot obtain reimbursement until the total amount of the specified benefits that may become due have been paid; it means only that the employer and carrier must in every instance pay the specified benefits to the claimant as they become due and only then seek reimbursement for excess compensation, because the Fund is not required to make any contemporaneous payments directly to the claimant. This meaning of the statutory scheme is made all the more clear by reference to the provisions in subsection 440.49(2)(a) specifying that this statute only creates a right to reimbursement in the employer and carrier who has already paid benefits and does not create or provide benefits for injured employees not otherwise provided by chapter 440.